# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
### FORT WAYNE DIVISION

| | | |
|---|---|---|
| C.S., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CAUSE NO. 1:10-CV-231 |
| | ) | |
| AUSTIN COUCH, JERRY LANGE, | ) | |
| NICOLE SINGER, and SMITH-GREEN | ) | |
| COMMUNITY SCHOOLS CORPORATION, | ) | |
| | ) | |
| Defendants. | ) | |

## OPINION AND ORDER

## I.  INTRODUCTION

This case arises out of a series of allegedly discriminatory school incidents that the Plaintiff, C.S., a minor, believes were perpetuated against him because of his race.  Based on these events, C.S., through his next friend and Parents, advances various federal claims against the Smith-Green Community Schools Corporation ("Smith-Green") and several of its administrators, individual Defendants Austin Couch, Jerry Lange, and Nicole Singer (collectively, "Defendants").[1]  On September 9, 2011, Defendants moved for summary judgment on all of C.S.'s claims.  (Docket # 24.)  C.S. filed his response in opposition on November 4, 2011 (Docket # 32), and Defendants replied on November 18, 2011 (Docket # 35).  As such, the motion is now ripe for ruling.  For the following reasons, the Defendants' Motion for Summary Judgment will be GRANTED as to all of C.S.'s claims.

---

[1]Accordingly, subject matter jurisdiction arises under 28 U.S.C. § 1331.  Jurisdiction of the undersigned Magistrate Judge is based on 28 U.S.C. § 636(c), all parties consenting.  (*See* Docket # 15.)

## II. PROCEDURAL BACKGROUND[2]

In his Complaint, C.S. brought the following federal claims against Defendants: (1) a racially hostile environment claim under Title VI of the Civil Rights Act, 42 U.S.C. § 2000(d); (2) a disparate discipline claim under Title VI; (3) an equal protection claim under the Fourteenth Amendment; (4) a due process claim under the Fourteenth Amendment; and (5) a false arrest claim under the Fourth Amendment. (Compl. Counts I-IV.) Defendants filed a Motion for Summary Judgment attacking each of these claims. (*See* Docket # 24, 25.) C.S.'s response, however, addresses only the Title VI racially hostile environment claim (*see* Pl.'s Resp. 4-6) and adds a new allegation that Defendants violated C.S.'s *Miranda* rights under the Fifth Amendment (*see* Pl.'s Resp. 6-8). Any issues raised in the summary judgment motion that are not responded to by the non-moving party are deemed abandoned. *See* FED. R. CIV. P. 56(e)(2); *Palmer v. Marion Cnty.*, 327 F.3d 588, 597-98 (7th Cir. 2003) (collecting cases). Therefore, C.S. is deemed to have abandoned the following claims: (1) the Title VI disparate discipline claim; (2) the Fourteenth Amendment equal protection claim; (3) the Fourteenth Amendment due process claim; and (4) the Fourth Amendment false arrest claim.

## III. FACTUAL BACKGROUND[3]

C.S. is a multi-racial student who attended Smith-Green schools until his expulsion

---

[2]Besides their Motion for Summary Judgment, Defendants also filed a Motion to Strike on November 18, 2011 (Docket # 33), asking the Court to strike evidence designated and cited in support of C.S.'s Response to Defendants' Motion for Summary Judgment but not submitted to the Court. C.S. filed a response on November 29, 2011, in which he submitted the previously omitted evidence (Docket # 37); Defendants replied on December 7, 2011, asking the Court again to strike this evidence and to deem the Defendants' proposed findings of fact admitted and uncontested (Docket # 38). However, even when considering the evidence that Defendants seek to strike, C.S.'s claims still fail as a matter of law and summary judgment is therefore appropriate. As such, the Court will consider the evidence that C.S. originally omitted and deem the Defendants' Motion to Strike (Docket # 33) MOOT.

[3]For summary judgment purposes, the facts are recited in the light most favorable to C.S., the nonmoving party. *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003).

during his freshmen year on April 10, 2009.  (Compl. ¶¶ 4, 10-11; *see* C.S. Dep. 34.)  Smith-Green operates Churubusco Middle School and Churubusco High School[4] as well as Churubusco Elementary School.  (Compl. ¶ 5.)

During the 2008-2009 academic year, C.S. was a freshman at Churubusco High School.  (C.S. Dep. 10, 34; Couch Dep. 9; Darnell Aff. Ex. 2.)  Throughout that same time period, Austin Couch was the principal of Churubusco High School (Compl. ¶ 6; *see* Couch Dep. 5), Jerry Lange was an assistant principal at Churubusco High School (Lange Dep. 12-13), and Nicole Singer was the principal of Churubusco Elementary School (Singer Dep. 13).

C.S. alleges several different incidents of racial harassment dating back to the fall of 2004 and continuing through his expulsion in April 2009.  (Compl. ¶¶ 12, 14; Pl.'s Answers to Defs.' Interrog. No. 5.)  The first alleged incident occurred in the fall of 2004, when another student called C.S. "Nigger."  (C.S. Dep. 19; Compl ¶ 12(a); Pl.'s Answers to Defs.' Interrog. No. 5.)  While C.S. testified that he did not remember this event (C.S. Dep. 19-20), his mother, T.L., remembered it and stated that she talked to C.S.'s teacher about the incident and that the student's parents brought him to their home (T.L. Dep. 19-20).[5]  During the 2005 to 2006 school year, when C.S. was in sixth grade, this same student drew a picture of C.S. getting shot in the head.  (C.S. Dep. 20; Compl. ¶ 12(a).)  C.S. never saw this picture, but his teacher saw it and

---

[4]In the 2010-2011 school year, Churubusco Middle School and High School converted from separate schools into Churubusco Junior-Senior High School.  (Davis Dep. 19.)

[5]T.L. testified that this student continued to say things to C.S., but she also stated that she did not know if C.S. was reporting these subsequent incidents to his teacher.  (T.L. Dep. 21-22.)  T.L. further testified about an incident in fifth grade in which two girls made up a "racially insulting story about C.S."  (T.L. Dep. 32.)  T.L.'s reason for believing there was a racial motive behind this incident was her belief that one of the girls and her family had a "problem with diversity."  (T.L. Dep. 32-34.)  While C.S.'s answer to the Defendants' fifth interrogatory indicates that C.S.'s fifth grade teacher informed T.L. that she would talk to the principal about these incidents (Pl.'s Answers to Defs.' Interrog. No. 5), T.L. testified that she did not recall if the first incident—C.S. being called a racial epithet—was ever "reported up the ladder" at Smith-Green (T.L. Dep. 19-20).

informed C.S. (C.S. Dep. 21.) According to C.S., his teacher contacted both the principal and the student's parents, and the student was subsequently suspended. (C.S. Dep. 21-22.) As far as C.S. knew, the picture did not contain any racial epithet. (C.S. Dep. 22.)

When C.S. was in seventh grade, during the 2006 to 2007 school year, he began to have problems with racial comments on the football field from an eighth grader, J.L. (C.S. Dep. 22-23, 25; T.L. Dep. 45-46; Compl. ¶ 12(b).) Two football coaches were informed of this racial harassment[6] (C.S. Dep 24; T.L. Dep. 45; Pl.'s Answers to Defs.' Interrog. No. 5), but C.S. was not aware of the coach doing anything about it (C.S. Dep. 24). Other than telling the coach one time, C.S. did not report the comments on the football field to anyone else. (C.S. Dep. 24.)

The following school year (2007 to 2008), when C.S. was in eighth grade, this same student, J.L., threatened to kill C.S. on his birthday after instructing his friends to beat C.S. up in the bathroom.[7] (C.S. Dep. 25-27; Compl. ¶ 12(b)-(c).) C.S. reported this threat to the middle school principal. (C.S. Dep. 21.) While C.S. did not know if J.L. was disciplined for this, T.L. testified that she believed J.L. was suspended for three days because of this threat. (T.L. Dep. 45, 48.) The bathroom incident involved C.S. being called "Nigger" and being thrown into a bathroom stall where he hit his head on a radiator. (C.S. Dep. 27-28; T.L. Dep. 52.) C.S. reported this incident to the school nurse and the principal, and he thought the students responsible were suspended. (C.S. Dep. 29-30.) That same school year, on May 15, 2007,

---

[6]C.S. stated that he reported these comments to the head coach (C.S. Dep. 24); T.L testified that she informed one of the assistant coaches (T.L. Dep. 45). T.L. did not know if this incident was reported to the school. (T.L. Dep. 46.)

[7]The Complaint alleges that the bathroom incident occurred after J.L. threatened to kill C.S. on his birthday. (Compl. ¶ 12(c).) C.S. testified, however, that he thought the bathroom incident took place before his birthday. (C.S. Dep. 28.)

another student, S.W., allegedly called C.S. "Nigger" and punched him in the face without warning. (C.S. Dep. 32.) This event may have been reported to the school nurse and "unknown representatives of the school." (*See* Pl.'s Answers to Defs.' Interrog. No. 5.)

Some time in 2008, another student called C.S. "Nigger." (Pl.'s Answers to Defs.' Interrog. No. 5.) It is unknown whether this incident was reported or if there was punishment. (Pl.'s Answers to Defs.' Interrog. No. 5.) During the 2008-2009 school year, a fight between S.W. and C.S. occurred in Phil Allen's agricultural classroom.[8] (Compl. ¶ 12(e); C.S. Dep. 34; Allen Dep. 22-23; Pl.'s Answers to Defs.' Interrog. No. 5.) According to C.S., the incident started when a third student threw a piece of paper that hit S.W., and S.W., thinking C.S. had thrown the paper, got up, punched C.S. in the face, and threw him into a filing cabinet. (C.S. Dep. 34; *see* Pl.'s Answers to Defs.' Interrog. No. 5.) C.S. agreed that the reason S.W. punched him was because of his mistaken belief that C.S. had thrown the paper, not because of C.S.'s race. (C.S. Dep. 34-35.) Allen also testified about the incident in his classroom, stating that the

---

[8]The record is ambiguous as to when and where the incident in Phil Allen's classroom actually occurred. In C.S.'s deposition, he indicates that the fight in Allen's classroom occurred on May 15, 2007. (C.S. Dep. 32.) However, in Allen's deposition, he testified that the incident in his classroom took place during "that school year," seemingly referencing the 2008-2009 school year. (*See* Allen Dep. 22.) While C.S. alleged in his Complaint and the answer to the Defendants' fifth interrogatory that this incident involved him being called a racial epithet, punched in the face, and being thrown into a filing cabinet, Allen was not aware of an event where C.S. was thrown into a filing cabinet (Allen Dep. 23), and Lange was not aware of such an incident either (Lange Dep. 62). Adding to the lack of clarity, Defendants treat the alleged filing cabinet incident and the fight in Allen's classroom as two different events. (*See* Defs.' Mem. in Supp. of Summ. J. 12.) Nonetheless, C.S.'s answer to the Defendants' fifth interrogatory makes the record slightly clearer. This answer states that the other student calling C.S. a racial epithet, punching him, and throwing him into the filing cabinet happened in early 2009 and that Phil Allen was one individual having information concerning this event. Moreover, T.L. testified that the fight in which C.S. was thrown into a filing cabinet in Allen's classroom happened in C.S.'s freshman year (2008 to 2009), which was "the first year Mr. Allen was there." (T.L. Dep. 62.) Therefore, based on this record, it appears that a fight took place in Allen's classroom some time during the 2008-2009 school year, before C.S.'s expulsion, rather than in 2007, and that these events—the alleged filing cabinet incident and the fight in Allen's classroom—were the same occurrence. However, whether this fight involved C.S. being thrown into a filing cabinet is disputed. It would then appear that a separate incident occurred on May 15, 2007, when S.W. allegedly called C.S. a racial epithet and punched him in the face without warning. (C.S. Dep. 32.) At the same time, whether these were three events or two, and whether the fight in Allen's classroom involved C.S. being thrown into a filing cabinet, are not material facts precluding summary judgment.

fight occurred when C.S. apparently said something to S.W., that both kids were on opposite sides of the room, and that S.W. then went after C.S. for what was said.  (Allen Dep. 23.)  Allen stated that a few punches were thrown, but he was not sure that any of them connected, and that he did not hear S.W. call C.S. any racial epithet.  (Allen Dep. 23.)  Once the fight was broken up, Allen sent S.W. to the office, then waited about five minutes before sending C.S.  (Allen Dep. 23.)

Shortly after the fight in Allen's classroom, in January or February 2009, another student told C.S. to "go back to Africa" while in the classroom, then, when C.S. went to the bathroom, the other student turned the lights out and said to C.S., "Now I can't find you."  (C.S. Dep. 35-36; Pl.'s Answers to Defs.' Interrog. No. 5; Compl. ¶ 12(f).)  C.S. indicated that he did not report this incident to anyone and that the school did not know about it.  (C.S. Dep. 36-37, 61-62.)

On February 10, 2009, C.S. was presented with a "hate" note by a student picturing a Confederate flag underneath of which read, "Niggers beware," and "Niggers must be hung," with a stick figure showing an African-American hanging from a tree.  (C.S. Dep. 37-38; Lange Dep. 58; Pl.'s Answers to Defs.' Interrog. No. 5; Compl. ¶ 12(g).)  Lange, an assistant principal, became aware of this incident, and the student responsible for the note was suspended pending expulsion; he was subsequently allowed to return on a waiver of due process.  (Lange Dep. 58-59.)

T.L. met with school officials regarding the alleged incidents of racial harassment and violence.  (Compl. ¶ 13.)  After C.S. was assaulted in the bathroom in April 2007, T.L. met with the middle school principal to institute a diversity program in the Churubusco schools.  (Compl. ¶ 13; Davis Dep. 32; T.L. Dep. 53.)  While a diversity program was not implemented at that

time, it was later, in February of 2009, in the middle school.[9]  (Davis Dep. 32; Couch Dep. 16; *see* Defs.' Answer to Pl.'s Interrog. No. 10.)  On December 18, 2008, both of C.S.'s parents expressed their concern about racial discrimination and the racial culture of the school to Couch and Lange.[10]  (Compl. ¶ 13; T.L. Dep. 89; Couch Dep. 15.)

Also during the 2008-2009 school year, C.S. was disciplined several times for violating the "Code of Conduct" set forth in the Churubusco High School Student Handbook, which was given to every student before the start of the year.  (Lange Aff. ¶¶ 6-7.)  C.S.'s first significant discipline occurred as a result of a series of behavior over several days, from December 4, 2008, to December 8, 2008, culminating in an all day "RS" on December 9, 2008.  (Lange Aff. ¶¶ 8-9.)  Specifically, on December 4, 2008, C.S. admittedly slapped another student and also made fun of a second student's family.  (Lange Aff. ¶ 9.)  On December 5, 2008, C.S. exchanged inappropriate words with a junior high student, threatened to fight the student, and later approached this student at his locker.  (Lange Aff. ¶ 10.)  Then, on December 8, 2008, C.S. called the same junior high student a "bitch" and later flipped him off in the hallway.  (Lange Aff. ¶ 11.)

A little over a week later, on December 18, 2008, C.S. was involved in a fight with another student in the boys' locker room.  (Lange Aff. ¶ 12.)  The fight began as horseplay; the other student slapped C.S. in the face with a towel, and C.S. then whipped him with a towel in

---

[9]Lange testified that he was not aware of any diversity or hate training in the high school.  (Lange Dep. 66.)  According to Couch, all of the training was for students, rather than for teachers and staff.  (Couch Dep. 17.)

[10]According to T.L., during this meeting, Couch admitted there was a diversity problem.  (T.L. Dep 89.)  Couch, however, testified that he told C.S.'s parents that the culture was definitely different at Churubusco than South Side High School, in Fort Wayne, Indiana, where Couch had come from, and that "sometimes these students are not as aware culturally," or "something along those lines."  (Couch Dep. 16.)

return, which caused a fight to break out. (C.S. Dep. 55-56.) C.S. stated that no racial words were exchanged. (C.S. Dep. 56.) Both C.S. and the other student accepted part of the blame and were given the same discipline.[11] (Lange Aff. ¶ 12; C.S. Dep. 57; Darnell Aff. Ex. 1.)

On February 17, 2009, C.S. sprayed "Fart Spray" in English class, resulting in the evacuation of the room and cancellation of class. (Darnell Aff. Ex. 1; C.S. Dep. 57.) C.S. admitted that he sprayed this odor and that he violated school policy in doing so. (C.S. Dep. 58.) C.S. was subsequently suspended out of school for three days. (Darnell Aff. Ex. 1.)

On March 9, 2009, Lange received a complaint from a female student, who accused C.S. of touching her inappropriately on the bus ride home on March 6th. (Darnell Aff. Ex. 1; Lange Dep. 21-22; Lange Aff. Ex. 2.) She claimed that C.S. touched her breast and repeatedly put his fingers and hand down her shirt. (Lange Aff. Ex. 2; Darnell Aff. Ex. 1.) The female student reported telling C.S. to stop multiple times and that she hit his hand away. (Lange Aff. Ex. 2; Darnell Aff. Ex. 1.) She also alleged that C.S. made sexual comments to her and tried to slide his hand over her crotch. (Lange Aff. Ex. 2; Darnell Aff. Ex. 1.) At his deposition, C.S. testified that nothing inappropriate or sexual was said and that the female student had asked C.S. to feel the muscles on her arm, and he had done so. (C.S. Dep. 45.)

After receiving this report of sexual misconduct, Lange and Couch investigated the matter and interviewed C.S. and other students on the bus who were sitting around C.S. on that day, obtaining written statements from C.S. and students who indicated that they saw or heard something. (Lange Dep. 24, 26, 38; Lange Aff. Exs. 1-9.) They also talked to a handful of

---

[11]It is unclear whether C.S. and the other student received three days of out-of-school suspension (*see* C.S. Dep. 57; T.L. Dep. 88-89) or just one-and-a-half days of out-of-school suspension (*see* Lange Aff. ¶ 12; Darnell Aff. Ex. 1). Regardless, there is no dispute that C.S. and the other student received the same punishment for this incident. (C.S. Dep. 57; Lange Aff. ¶ 12.)

students who did not write statements because, when asked if they had seen or heard anything on the bus that day, the students did not know what Lange was talking about. (Lange Dep. 37-39.) The school found that statements from witnesses on the bus verified that C.S. made inappropriate comments and inappropriately touched the female student. (Darnell Aff. Ex. 1.)

The school's investigation also revealed that C.S. had touched and made inappropriate comments to the complainant on prior occasions as well and that he also made inappropriate sexual comments to another girl.[12] (Darnell Aff. Ex. 1; Lange Dep. 24.) Based on the additional information provided by these students, Lange obtained a second written statement from the first complainant regarding the prior alleged incidents, in which she claimed that C.S. had made previous sexual comments to her. (Lange Dep. 24; Lange Aff. Ex 3.) Due to the nature of the incidents, the police were notified. (Darnell Aff. Exs. 1, 9.)

On March 10, 2009, C.S. gave his written incident statement in which he denied touching the complainant inappropriately and admitted that he made one inappropriate comment to her on March 6th, which was after another student made a sexual comment to her, and another inappropriate thing on a previous occasion, which he could not remember. (Lange Aff. Ex. 1.) C.S. made this statement while in Lange's office with only Couch present. (C.S. Dep. 50.) C.S. testified that Couch was "pressuring [him] to write a statement" and told him "to include everything that happened." (C.S. Dep. 50.)

After obtaining these statements, Lange and Couch presented the students' statements to

---

[12]According to C.S., the female students and the witnesses were members of a group that had repeatedly racially discriminated against him, and, as such, C.S. believes that they fabricated this sexual harassment incident. (Pl.'s Answer to Defs.' Interrog. No. 5; Compl. ¶ 14.) C.S. stated that some of the kids involved had called him the "N" word before, but that the first complainant had never done so. (C.S. Dep. 52.) C.S. further alleges that Couch and Lange ignored the gross inconsistencies of the statements given and ignored the statements of a witness who was sitting three feet away and heard and saw nothing. (Pl.'s Answer to Defs.' Interrog. No. 5.)

Superintendent Bruce Hippensteel and gave him an overview of the information they had gathered at that point. (Lange Dep. 17-18.) Following this consultation, the Superintendent decided that expulsion proceedings should be initiated against C.S. (Lange Dep. 15, 17, 30.)

T.L. was notified of the allegations against C.S. on March 10, 2009.[13] After informing her husband, T.L. went to the school, where Lange and Couch informed her of the exact allegations against C.S. and that C.S. would be suspended for ten days pending expulsion. (T.L. Dep. 93.; Darnell Aff. Ex. 1.) T.L. then met with a Churubusco Police Officer and a Whitley County Detective in Couch's office. (T.L. Dep. 94.) At this point, T.L. had not yet seen C.S., who was in another room. (T.L. Dep. 94.) Once meeting with the officers, she asked if she could talk to C.S., and C.S. subsequently came into the room. (T.L. Dep. 94.) Before leaving, T.L. was given one letter which provided the details of the disciplinary action against C.S. (T.L. Dep. 92-93, 96; Darnell Aff. Ex. 1) and another telling her to take C.S. to Whitley County Juvenile Probation in a week (T.L. Dep. 96-97). On March 18, 2009, after a preliminary inquiry by Whitley County Juvenile Probation Department, all charges against C.S. were dismissed. (Pl.'s Answer to Defs.' Interrog. No. 5.)

Superintendent Hippensteel selected Singer, the principal of Churubusco Elementary School, to be the expulsion examiner. (Singer Dep. 35-36.) After receiving notification of her selection, Singer collected the documents that were relevant to the accusation against C.S., asking the school to give her everything that its administrators had used in the scope of their investigation. (Singer Dep. 40.) However, besides asking Lange and Couch for this information,

---

[13]T.L. testified that Lange first informed her of the allegations on the Tuesday following the incident. (T.L. Dep. 92-93.) While T.L. indicates that this was the 8th or 9th of March (T.L. Dep. 92-93), Tuesday would have fallen on March 10, 2009.

Singer did not recall any other conversations with either Lange or Couch concerning C.S.'s expulsion hearing.  (Singer Dep. 44.)  The documents she received included the student witness statements and a document from the school recommending expulsion that also detailed C.S.'s other infractions from the school year.  (Singer Dep. 44.)

After C.S. was suspended, his parents requested expedited testing to determine if C.S. qualified for special education services.  (Lange Dep. 40; T.L. Dep. 131.)  As the testing determined that C.S. was eligible for special education services in the areas of math reasoning and math calculation, a manifestation meeting was held on April 9, 2009, within a case conference committee session, to determine if C.S.'s disability played a role in his actions on March 6, 2009.  (Darnell Aff. Exs. 2-7; Lange Aff. ¶ 13; Lange Dep. 40.)  C.S., his parents, and Lange were among those present at the manifestation meeting.  (Darnell Aff. Ex. 7.)  It was determined that C.S.'s conduct on March 6th was not caused by and did not have a direct and substantial relationship to his disability and that C.S.'s conduct was not a direct result of the public agency's failure to implement an individualized education program.  (Lange Aff. ¶ 13; Darnell Aff. Exs. 7, 9.)  As such, the school's disciplinary procedures applied to C.S.  (Lange Aff. ¶ 14.)

During the case conference on April 9, 2009, C.S. and his parents were offered a "Waiver of Due Process Rights: Probationary Continued Education Agreement," which would have placed C.S. on a probationary continued education program in lieu of expulsion.  (Darnell Aff. Ex. 8; Lange Aff. ¶ 15.)  However, neither C.S. nor his parents accepted this offer.  (*See* Darnell Aff. Ex. 8.)

On April 10, 2009, Singer conducted an expulsion hearing in C.S.'s case.  (Darnell Aff.

Ex. 9.)  C.S. was represented by his parents; Churubusco High School was represented by Lange and Couch.  (Darnell Aff. Ex. 9.)  At the hearing, both C.S. and the school presented exhibits and provided evidence in support of their case.  (Darnell Aff. Ex. 9.)  T.L. felt as though she were given an opportunity to present all the evidence she wanted at the expulsion hearing.  (T.L. Dep. 118.)  Singer reviewed all relevant testimony and evidence and excluded some.  (Darnell Aff. Ex. 9.)  On April 17, 2009, Singer rendered her decision, determining that C.S. violated the Churubusco High School Code of Conduct and that the evidence supported C.S.'s expulsion for one semester.  (Darnell Aff. Ex. 9.)

Accordingly, C.S. was expelled for one semester.  (Darnell Aff. Ex. 9.)  Smith-Green continued to provide special education services to C.S. on the Home Bound program.  (T.L. Dep. 130.)  Although C.S. was eligible to return to Smith-Green at the beginning of the 2009-2010 school year (Darnell Aff. Ex. 9), C.S. enrolled at Cornerstone Christian School instead (T.L. Dep. 118).

## IV.  STANDARD OF REVIEW

Summary judgment may be granted only if there are no disputed genuine issues of material fact.  *Payne*, 337 F.3d at 770.  When ruling on a motion for summary judgment, a court "may not make credibility determinations, weigh the evidence, or decide which inferences to draw from the facts; these are jobs for a factfinder."  *Id.*  The only task in ruling on a motion for summary judgment is "to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial."  *Kodish v. Oakbrook Terrace Fire Prot. Dist.*, 604 F.3d 490, 507 (7th Cir. 2010) (quoting *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994)).  If the evidence is such that a reasonable factfinder could return a verdict in favor of the

nonmoving party, summary judgment may not be granted. *Payne*, 337 F.3d at 770. A court must construe the record in the light most favorable to the nonmoving party and avoid "the temptation to decide which party's version of the facts is more likely true," as "summary judgment cannot be used to resolve swearing contests between litigants." *Id.* However, "a party opposing summary judgment may not rest on the pleadings, but must affirmatively demonstrate that there is a genuine issue of material fact for trial." *Id.* at 771.

# V. DISCUSSION

After winnowing the case down, the Court will now address C.S.'s remaining two claims: (1) a racially hostile environment under Title VI and (2) a violation of C.S.'s *Miranda* rights under the Fifth Amendment.

## A. *Title VI Hostile Environment Claim*[14]

C.S.'s Title VI claim is premised on the argument that Smith-Green intentionally created

---

[14]In the Complaint, C.S. brings Title VI claims against the individual Defendants in their official and individual capacities. (*See* Compl. ¶¶ 6-8.) Defendants argue that a Title VI action cannot be maintained against an individual and, therefore, that summary judgment in favor of the individual Defendants is appropriate on the Title VI claim. (Defs.' Mem. in Supp. of Summ. J. 9-10.) Because C.S. does not respond to this argument, it is deemed abandoned. *Palmer*, 327 F.3d at 597-98; *Arendt v. Vetta Sports, Inc.*, 99 F.3d 231, 237 (7th Cir. 1996); *Walton v. U.S. Steel*, No. 2:07 cv 331, 2011 WL 926899, at *2 (N.D. Ind. Mar. 15, 2011); *White v. Geradot*, No. 1:05-cv-382, 2007 WL 541819, at *6 n.11 (N.D. Ind. Feb. 15, 2007).

Nevertheless, the Court briefly notes that Title IX of the Civil Rights Act is modeled after Title VI such that the two statutes operate in the same manner, *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 286 (1998), and "a decision with respect to one statute applies to the other statute," *Doe v. Galster*, No. 09-C-1089, 2011 WL 2784159, at *6 (E.D. Wis. July 14, 2011). Therefore, as the Seventh Circuit Court of Appeals has held that a plaintiff cannot maintain a Title IX action against a high school principal or assistant principal in either their individual or official capacities because a private cause of action under Title IX could only be brought against the *recipient* of federal grant money, not an individual, *Smith v. Metro. Sch. Dist. Perry Twp.*, 128 F.3d 1014, 1019-21 (7th Cir. 1997), this rule applies to Title VI claims as well, *see Roger C. ex rel. Gilbert v. Valley View Pub. Sch. Dist. No. 365-U*, No. 08 C 1254, 2008 WL 4866353, at *8 (N.D. Ill. June 23, 2008) (holding that "[b]ecause Section 2000(d) prohibits discrimination by recipients of federal funding, [ ] individual defendants cannot be held liable for violations of Title VI"). Accordingly, C.S.'s Title VI claims against the individual Defendants fail as a matter of law, and the Court GRANTS summary judgment in favor of the individual Defendants, Couch, Lange, and Singer, on the Title VI claims. *Cf. Renguette v. Bd. of Sch. Tr. ex rel. Brownsburg Cmty. Sch. Corp.*, 540 F. Supp. 2d 1036, 1043 (S.D. Ind. 2008) (holding that Title IX claims brought against individually named defendants fail as a matter of law).

and tolerated a hostile racial environment. (Pl.'s Resp. 4.) In describing this environment, C.S. points to a number of allegedly racially motivated incidents committed by students against him[15] as well as purported discriminatory actions by Couch, Lange, and Singer in regards to the sexual harassment allegations against C.S. and his expulsion.[16] (*See* Compl. ¶¶ 11-12, 14, 17; Pl.'s Resp. 7-8.) The Court first addresses C.S.'s claims of student-on-student harassment.

---

[15]C.S.'s allegations of racial harassment date back to the fall of 2004. Defendants argue (without any mention of possible tolling due to C.S.'s minority) that any incident which occurred prior to July 19, 2008, may not be the basis of any claim under Title VI because they are barred by the two-year statute of limitations applicable to personal injury actions in Indiana. (Defs.' Mem. in Supp. of Summ. J. 12 n.1.) In the Seventh Circuit, however, the statute of limitations for Title VI claims is somewhat unclear. *Compare Beard v. Robinson*, 563 F.2d 331, 338 (7th Cir. 1977) (holding that Illinois's five-year statute of limitations for "actions not otherwise provided for," rather than the two-year period for torts, applies to statutory claims brought under the Civil Rights Acts), *Brewer v. Bd. of Tr. of the Univ. of Ill.*, 407 F. Supp. 2d 946, 961 (C.D. Ill. 2005) (applying a five-year statute of limitations to Title VI claims under Illinois law), *and Torrespico v. Columbia Coll.*, No. 97 C 8881, 1998 WL 703450, at *11 n.9 (N.D. Ill. Sept. 30, 1998) (stating that Title VI claims may be subject to a five-year statute of limitations), *with Doe v. Howe Military Sch.*, 227 F.3d 981, 989 (7th Cir. 2000) (declining to address whether a district court's borrowing of state statute of limitations for Title IX claims was correct because it went unchallenged), *Allen v. Ind. Univ. Nw.*, No. 2:09-CV-24-JVB, 2009 WL 2245061, at *3 (N.D. Ind. July 24, 2009) (holding that Title IX claims are subject to Indiana's two-year statute of limitations for personal injury torts), *and Monger v. Purdue Univ.*, 953 F. Supp. 260, 264 (S.D. Ind. 1997) (same). Several circuits that have addressed the question held that Title VI claims are subject to the state limitations period for personal injury claims. *Rozar v. Mullis*, 85 F.3d 556, 560-61 (11th Cir. 1996); *Egerdahl v. Hibbing Cmty. Coll.*, 72 F.3d 615, 618 (8th Cir. 1995); *Taylor v. Regents of the Univ. of Cal.*, 993 F.2d 710, 712 (9th Cir. 1993); *Baker v. Bd. of Regents of State of Kan.*, 991 F.2d 628, 631 (10th Cir. 1993); *Frazier v. Garrison I.S.D.*, 980 F.2d 1514, 1520-22 (5th Cir. 1993); *see Carter v. Univ. of Conn.*, 264 F. App'x 111, 111 (2d Cir. 2008) (noting that the parties do not dispute that Connecticut's three-year personal injury state of limitations applies to the plaintiff's Title VI claims).

Nonetheless, despite this uncertainty, the Court does not have to decide this question today. Even considering all of C.S.'s allegations dating back to the fall of 2004, C.S.'s Title VI claim fails as a matter of law. Moreover, if the Court followed the other circuits and did not consider those incidents occurring before July 19, 2008, C.S.'s claim is even weaker and, thus, would still fail. No matter what statute of limitations is applied, it does not change the outcome of this case; Smith-Green is entitled to summary judgment on C.S.'s Title VI claim.

[16]In his Response, C.S. argues that the "whole expulsion process was racially motivated," that C.S.'s expulsion was "the only case in school history where police authorities found that there was no cause to prefer charges, but the school corporation proceeded with the expulsion regardless," that "C.S. was the first student expelled from Churubusco High School for sexual harassment in the ten years prior to his expulsion," and that the "school intentionally failed to obtain exculpatory statements" and "did not determine whether C.S.'s activities on the bus were a manifestation of his attention deficit-hyperactivity disorder." (Pl.'s Resp. 8.) While these allegations could be relevant to a disparate discipline claim, C.S. argues that "this again is evidence of a hostile racial environment at Smith-Green" and makes no argument in his Response that these actions amount to disparate discipline. (Pl.'s Resp. 8.) As such, the Court, once again, deems C.S.'s disparate discipline claim to be abandoned and does not address it.

*1. Student-on-Student Harassment*

Student-on-student harassment can give rise to a federal claim against a public school who receives federal funding under Title VI. *Curley ex rel. Curley v. Hill*, No. IP97-0570-C-H/G, 2000 WL 1708007, at *1 (S.D. Ind. Sept. 7, 2000); *cf. Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 650 (1999) (dealing with Title IX claims). In these cases, the standard is one of "deliberate indifference." *Davis*, 526 U.S. at 650; *Curley*, 2000 WL 1708007, at *1. Therefore, to hold a public school liable in a Title VI action on the basis of student-on-student harassment, the plaintiff must establish that (1) the school authorities acted with deliberate indifference toward harassment they actually knew about and (2) the harassment was so severe, pervasive, and objectively offensive as to deprive the victim of access to educational opportunities. *Curley*, 2000 WL 1708007, at *1 (citing *Davis*, 526 U.S. at 650). However, before evaluating whether Smith-Green's actions (or refusals to act) amounted to deliberate indifference, "*Davis* requires us to examine the student-on-student harassing conduct itself to determine whether it is 'so severe, pervasive, and objectively offensive' that is has a 'concrete, negative effect' on the victim's access to education." *Gabrielle M. v. Park-Forest-Chicago Heights, Ill. Sch. Dist. 163*, 315 F.3d 817, 821 (7th Cir. 2003) (quoting *Davis*, 526 U.S. at 650).

*a. Severe, Pervasive, and Objectively Offensive Harassment*

In order to hold a funding recipient liable under Title VI for a racially hostile environment, "a plaintiff must establish [racial] harassment of students that is so severe, pervasive, and objectively offensive, and that so undermines and detracts from the victims' educational experience, that the victim-students are effectively denied equal access to an institution's resources and opportunities." *Davis*, 526 U.S. at 651. Because of the nature of a

school setting, where students often engage in upsetting insults, banter, teasing, and shoving amongst each other, "damages are not available for simple acts of teasing and name-calling among school children, [ ] even where these comments target differences in [race]." *Id.* at 652.

To recover damages, such student-on-student harassment must be so severe, pervasive, and objectively offensive that it denies its victims equal access to education. *Id.* The harassment must further have a "concrete, negative effect" on the victim's education, which may include dropping grades, becoming homebound or hospitalized due to harassment, physical violence, or physical exclusion from a school resource. *See id.* at 650-51; *Gabrielle M.*, 315 F.3d at 823; *S.G. v. Rockford Bd. of Educ*, No. 08 C 50038, 2008 WL 5070334, at *4 (N.D. Ill. Nov. 24, 2008); *see also Trentadue v. Redmon*, 619 F.3d 648, 654 (7th Cir. 2010) (stating that the record failed to suggest the plaintiff was subjected to student-on-student harassment that was so pervasive, severe, and objectively offensive as to deny her equal access to education when her grades did not suffer, she was not extensively absent from school, she graduated with a class rank of 27 out of over 500, and then enrolled in college). If the plaintiff also experienced some kind of emotional trauma as a result of the harassment, like suicidal thoughts or a diagnosis of depression, in addition to the more tangible effects such as dropping grades or increased absenteeism, then such trauma can contribute to a conclusion that the severity and pervasiveness requirement is satisfied. *See Davis*, 526 U.S. at 653 (finding that sexual harassment met the severity and pervasiveness requirement when plaintiff alleged that, as a result of this harassment, her grades dropped and she had written a suicide note); *Vance v. Spencer Cnty. Pub. Sch. Dist.*, 231 F.3d 253, 261 (6th Cir. 2000) (holding that the severity and pervasiveness requirement was met when the plaintiff in a Title IX case was the victim of verbal and physical attacks, withdrew

from school, and was diagnosed with depression).  Moreover, "[w]hether [racially] harassing conduct is actionable 'depends upon the constellation of surrounding circumstances, expectations, and relationships, including, but not limited to, the ages of the harasser and victim and the number of individuals involved.'" *Stanley v. Carrier Mills-Stonefront Sch. Dist. No. 2*, 459 F. Supp. 2d 766, 777 (S.D. Ill. 2006) (quoting *Davis*, 526 U.S. at 651).  Some other factors to consider include the children's knowledge of the nature of their actions and the impact, or lack thereof, on the plaintiff's ability to attend and perform at school.  *See Gabrielle M.*, 315 F.3d at 825.

In the instant case, C.S. asserts that other students perpetrated the following racially motivated discriminatory acts against him while he was a student in Smith-Green schools:  (1) when C.S. was a fifth-grader, another student called him a racial epithet; (2) in sixth grade, the same student drew a picture of C.S. getting shot in the head;[17] (3) in seventh grade, J.L. made racial comments to him on the football field; when C.S. was in eighth grade, (4) J.L. threatened to kill him on his birthday; (5) C.S. was called a racial epithet and thrown into a bathroom stall, hitting his head on a radiator; and (6) on May 15, 2007, another student, S.W., called C.S. a racial epithet and punched him in the face without warning; (7) sometime in 2008, another student called C.S. a racial epithet; during C.S.'s freshman year, (8) S.W. and C.S. got into a fight in Allen's classroom; (9) another student told C.S. to "go back to Africa," then turned out the lights and said to C.S., "Now I can't find you"; (10) C.S. was presented with a racially-charged hate note drawn by another student; and (11) in March 2009, a group of students who

---

[17]While C.S. did not see this picture and did not know if there was any racial dimension to it, a reasonable jury could conclude that it was racially motivated as it was drawn by the same student who had called C.S. a racial epithet the year before.

had previously racially discriminated against C.S. fabricated the sexual harassment incident on the bus that led to his expulsion.

This last allegation—that the sexual harassment allegations were fabricated by students who had previously discriminated against C.S.—is nothing more than speculation, and "reliance on speculation is not enough to get the case to a jury." *Overly v. KeyBank Nat'l Ass'n*, __ F.3d __, 2011 WL 5505338, at *6 (7th Cir. Nov. 10, 2011). C.S. offers no evidence even suggesting that the March 2009 sexual harassment allegations were fabricated by the students, much less that any fabrication was a result of racial discrimination. Such unsupported allegations do not provide evidence sufficient to withstand summary judgment.[18] *See Gabrielle M.*, 315 F.3d at 820 n.1.

While, accepting the remaining allegations as true, such racially hostile comments and racially motivated violence arguably created a severe and objectively offensive racial environment, C.S. fails to make the necessary link between this environment and a denial of educational opportunities and further fails to demonstrate a concrete, negative effect on his education as required by *Davis*. *See Davis*, 526 U.S. at 560; *Gabrielle M.*, 315 F.3d at 823. While such a denial may be evidenced by dropping grades or increased absenteeism, *see Davis*, 526 U.S. at 634; *Gabrielle M.*, 315 F.3d at 823-24, C.S. makes no allegations that the alleged harassment from other students lead to either of these things or otherwise affected his ability to perform at or attend school, and the record contains no evidence that it did.[19]

---

[18]Similarly, T.L.'s belief that the 2005 incident in which two girls alleged that C.S. made inappropriate comments to them was motivated by race is also based on speculation and, thus, does not warrant reliance.

[19]While T.L. stated that C.S. started struggling with his school work in the fourth grade, particularly with his math (T.L. Dep. 12-14), she then testified that she did not recall any correlation between the alleged racial harassment incidents in fifth grade and C.S's grades or behavior in school (T.L. Dep. 25).

As regards physical violence, while C.S. makes a few allegations of physical violence, his situation is distinguishable from that of the plaintiff in *Vance*, where the Sixth Circuit partly relied on acts of physical violence against the plaintiff in finding that the severity and pervasiveness requirement was met in a Title IX case. 231 F.3d at 259. In *Vance*, a male student stabbed the female plaintiff in the hand, and, on another occasion, two male students held her, while others grabbed her hair and started to yank off her shirt (one actually proceeding to remove his pants); she eventually experienced sexual harassment to the point where she was propositioned or touched inappropriately in virtually every class. *Id.* at 256-57. The plaintiff then filed a Title IX complaint with the school district, which resulted in the plaintiff being allowed to complete the remaining weeks of the school year at home, but no investigation into the allegations occurred. *Id.* at 257. She returned to the school the following year, but ultimately withdrew after only fifteen days; she was also diagnosed with depression. *Id.* In finding that these incidents satisfied the severity and pervasiveness requirement, the Sixth Circuit noted that "it is no wonder that [plaintiff] was diagnosed with depression." *Id.* at 259.

Here, C.S.'s most severe allegation of physical violence that school officials definitely knew about and that was not a two-sided fight, like the horseplay incident in ninth grade, occurred when C.S. was in eighth grade and involved him being thrown into a bathroom stall, where he then hit his head on a radiator. Unlike the school in *Vance*, rather than simply sending C.S. home to complete his studies and choosing not to investigate the allegations, Smith-Green's officials investigated the incident and punished the perpetrators. Moreover, C.S. never withdrew from Smith-Green schools because of verbal or physical attacks like the plaintiff in *Vance*. After the bathroom incident in eighth grade, C.S. remained in Smith-Green schools throughout that

year and into the next, and there is no evidence that this physical violence denied him equal access to Smith-Green's educational opportunities.

Although C.S. was ultimately expelled from Churubusco High School, liability under Title VI for student-on-student harassment requires that the plaintiff be denied an educational opportunity by the harasser's actions, s*ee Gabrielle M.*, 315 F.3d at 823, and C.S.'s expulsion was a result of his *own* actions rather than any racial harassment by other students.[20]  Moreover, even after expelling C.S., Smith-Green provided him with special education services through the Home Bound program.  Additionally, C.S. does not allege that, as a result of these allegedly racially hostile actions, he experienced any severe emotional trauma, such as suicidal thoughts or a diagnosis of depression, which, in other cases, have strengthened plaintiffs' claims that the harassment was so severe, pervasive, and objectively offensive that it denied them equal access to education.  *See Davis*, 526 U.S. at 653; *Vance*, 231 F.3d at 261.

### b. Deliberate Indifference

Nevertheless, even if the actions by other students were so severe, pervasive, and objectively offensive as to have a concrete, negative effect on C.S.'s access to education, Smith-Green's response to known incidents of harassment did not amount to deliberate indifference. Under Title VI, "recipients of federal funding may be liable for 'subject[ing]' their students to discrimination where the recipient is deliberately indifferent to known acts of student-on-student [racial] harassment and the harasser is under the school's disciplinary authority."  *Davis*, 526 U.S. at 646-47.  In terms of liability, the recipient is held liable for its *own* decision to remain

---

[20]While C.S. alleges that the sexual harassment allegations that lead to his expulsion were fabricated by a group of students out of racially discriminatory motives, this is, once again, pure speculation; there is no evidence in the record supporting this assertion.

idle in the face of known student-to-student harassment; therefore, liability arises from "an official decision by the recipient not to remedy the violation." *Id.* at 641-42 (quoting *Gesber*, 524 U.S. at 290). At the same time, a funding recipient is deemed to have acted with deliberate indifference "only where the recipient's response to the harassment or lack thereof is *clearly unreasonable* in light of the known circumstances." *Id.* at 648 (emphasis added). Accordingly, "deliberate indifference must, at a minimum, cause [students] to undergo harassment or make them liable or vulnerable to it." *Davis*, 526 U.S. at 645 (citation and internal quotation marks omitted) (alteration in original). On the other hand, funding recipients are not required to *remedy* peer harassment. *Gabrielle M.*, 315 F.3d at 825. As a matter of fact, "*Davis* disapproved of a standard that would force funding recipients to suspend or expel every student accused of misconduct." *Id.*; *see also Rost ex rel. K.C. v. Steamboat Springs RE-2 Sch. Dist.*, 511 F.3d 1114, 1123 (10th Cir. 2008) (holding that it was not clearly unreasonable for a school not to expel a student accused of sexual harassment). Importantly, "[t]he standard is not whether school officials acted reasonably or competently." *Curley*, 2000 WL 1708007, at *4.

Moreover, courts are to refrain from second-guessing school administrators' disciplinary decisions, and school administrators are to continue to have the flexibility they require in such decisions. *Davis*, 526 U.S. at 648. Accordingly, "courts have been skeptical of arguments premised on the degree to which a school punishes its students," and "[t]he Supreme Court has rejected the argument that 'victims of peer harassment . . . have a [Title VI] right to make particular remedial demands' on the school." *DT v. Somers Cent. Sch. Dist.*, 588 F. Supp. 2d 485, 494 (S.D.N.Y. 2008) (quoting *Davis*, 526 U.S. at 648-49).

When, after each reported or observed instance of harassment, the school disciplined the

perpetrator or took steps to prevent future inappropriate conduct, the school's response has been found not to be "clearly unreasonable." *Gabrielle M.*, 315 F.3d at 824; *see Soper v. Hoben*, 195 F.3d 845, 855 (6th Cir. 1999) (concluding that the defendants were not deliberately indifferent when, once learning of student-on-student sexual harassment, they, among other precautions, immediately contacted the proper authorities and investigated the incidents themselves); *Kinman v. Omaha Pub. Sch. Dist.*, 171 F.3d 607, 611 (8th Cir. 1999) (finding that defendants were entitled to judgment as a matter of law and that their actions were not deliberately indifferent when, instead of turning a blind eye and doing nothing in response to allegations of a sexual relationship between a teacher and student, they investigated those allegations and initiated termination proceedings once they obtained conclusive proof of that relationship).

On the other hand, courts have found the issue of deliberate indifference to preclude dismissal or a grant of summary judgment when the school made no effort whatsoever to either investigate harassment, stop it, or discipline the offending student. *See Davis*, 526 U.S. at 654 (finding that a lack of response could suggest "deliberate indifference" on the part of the school board, which made no effort whatsoever to either investigate or put an end to the harassment); *Murrell v. Sch. Dist. No. 1, Denver, Colo.*, 186 F.3d 1238, 1243 (10th Cir. 1999) (upholding plaintiff's claim of deliberate indifference when school did not inform law enforcement, investigate, or discipline the offending student). Although, as C.S. points out, the Sixth Circuit has held that "where a school district has actual knowledge that its efforts to remediate are ineffective, and it continues to use those same methods to no avail, such district has failed to act reasonably in light of known circumstances," *Vance*, 231 F.3d at 261, the Seventh Circuit has not adopted this construction of "deliberate indifference" and has reiterated that "[a]ll that *Davis*

requires is that the school not act *clearly unreasonably* in response to known instances of harassment," *Gabrielle M.*, 315 F.3d at 825 (citing *Davis*, 526 U.S. at 648-49) (emphasis in original).

Furthermore, because Smith-Green can only be held liable under Title VI for acts of student-on-student harassment about which it has actual knowledge, *Gabrielle M.*, 315 F.3d at 823; *see, e.g.*, *Davis*, 526 U.S. at 648; *Curley*, 2000 WL 1708007, at *1, only some of C.S.'s allegations, when viewed in the light most favorable to C.S., can form the basis for liability. For a few of the alleged incidents, the record is either devoid of evidence of whether the incident was reported or if the perpetrators were punished or Plaintiff is unaware of whether a report or punishment occurred. As such, based on the record, it appears as if only seven, maybe eight, of the alleged incidents were reported or otherwise made known to school officials.[21] Of these eight incidents, the record only contains evidence about the discipline of the perpetrators of five of the incidents: (1) the student responsible for the picture of C.S. getting shot in the head was suspended (C.S. Dep. 21-22); (2) the student responsible for the threat on C.S.'s life was apparently suspended for three days (T.L. Dep. 45, 48); (3) C.S. thought that the students who beat him up in the bathroom were suspended (C.S. Dep. 29-30); (4) both S.W. and C.S. were

---

[21]These seven events are the following: (1) the incident in fifth grade was reported to C.S.'s teacher, but T.L. did not recall if this incident was ever reported up the ladder at Smith-Green (T.L. Dep. 19-21); (2) the picture of C.S. getting shot in sixth grade was reported to the middle school principal (C.S. Dep. 21-22); (3) the racial comments on the football field were reported to two football coaches (C.S. Dep. 24; T.L. Dep. 45); (4) the threat to kill C.S. on his birthday was reported to the middle school principal (C.S. Dep. 21); (5) the bathroom incident was reported to the school nurse and the middle school principal (C.S. Dep. 29-30); (6) Allen, the agriculture teacher, was aware of the fight between S.W. and C.S. in his classroom; and (7) Lange, the assistant principal, was aware of the hate note given to C.S. in February 2009 (Lange Dep. 58-59). The eighth incident that was possibly reported was the May 15, 2007, incident in which S.W. allegedly punched C.S. in the face and called him a racial epithet. The answer to the Defendants' fifth interrogatory indicates that the school nurse and "unknown representatives of the school" had knowledge of this incident (Pl.'s Answers to Defs.' Interrog. No. 5), but the record is otherwise unclear about who was informed of this incident and how exactly Smith-Green and its administrators responded.

sent to the principal's office for the fight in Allen's classroom (Allen Dep. 23), but the record is

devoid of the punishment either received, if any; and (5) the student who wrote the hate note was

suspended pending expulsion, but allowed to return on a waiver of due process[22] (Lange Dep.

58-59).  In response to the racial comments on the football field, the record does not indicate

whether the two football coaches who were informed did anything to remedy the situation or

further report it.  C.S. testified that he was unaware of the coach he informed doing anything

(C.S. Dep. 24), and T.L. testified that she did not know whether the coach she talked to further

reported these comments either (T.L. Dep. 46).  As for the incident in Allen's classroom,

according to C.S.'s deposition, this fight occurred because S.W. thought C.S. had thrown a piece

of paper at him, and C.S. agreed that it had nothing to do with his race.  (C.S. Dep. 34-35.)

Thus, it does not appear to have been racially motivated.

       Therefore, based on the record as it stands now, of the six incidents allegedly motivated

by race and of which school officials were definitely aware, the school took disciplinary action

against the perpetrators in four.  Instead of turning a blind eye to the harassment and doing

nothing, the school officials investigated the matter and disciplined the students responsible,

seemingly suspending each one and suspending (pending expulsion) the student responsible for

the hate note.  Accordingly, as regards to these incidents, the school investigated the matter and

disciplined the perpetrator, making the school's response not clearly unreasonable.  *See*

*Gabrielle M.*, 315 F.3d at 824, *Soper*, 195 F.3d at 855; *Kinman*, 171 F.3d at 611; *cf. Davis*, 526

U.S. at 654 (finding that a failure to investigate could constitute deliberate indifference); *Murrell*

---

[22]The Court notes that C.S. was given this same option after he was accused of sexual harassment, but C.S. and his parents did not accept it.  (*See* Darnell Aff. Ex. 8.)

*v. Sch. Dist. No. 1, Denver, Colo.*, 186 F.3d 1238, 1243 (10th Cir. 1999) (upholding claim of deliberate indifference when school did not inform law enforcement, investigate, or discipline the offending student). Moreover, Smith-Green was not required to expel the students responsible for the racial harassment, which makes their decision to only suspend them or otherwise discipline them not clearly unreasonable. *See Rost*, 511 F.3d at 1123; *Gabrielle M.*, 315 F.3d at 825. While Smith-Green and the individual Defendants could have done more, like instituting a diversity program as C.S.'s parents requested, they are not required to remedy peer harassment and, therefore, the fact that they did not remedy it does not make what they did do—investigate the incidents and punish those responsible—clearly unreasonable. *See Gabrielle M.*, 315 F.3d at 825. Smith-Green was not required to respond reasonably or competently, but only to respond in a way that was not clearly unreasonable. *Curley*, 2000 WL 1708007, at *4. Additionally, Smith-Green's response to known incidents of racial harassment did not cause C.S. to undergo harassment or make him vulnerable to it, as is required for deliberate indifference. *Davis*, 526 U.S. at 645.

At the same time, even though they were not required to do so, Smith-Green *did* institute diversity training for students in the middle school in February of 2009. (Davis Dep. 32; Couch Dep. 16; *see* Defs.' Answer to Pl.'s Interrog. No. 10.) While C.S. was in high school by this point, that it took time to implement such a program does not make Smith-Green's response to the concerns of C.S. and his parents "clearly unreasonable." Therefore, at least in the middle school, it appears as though Smith-Green was attempting to do something besides merely disciplining students responsible for racial harassment to remedy any hostile racial environment. Accordingly, even under the Sixth Circuit's interpretation of deliberate indifference—requiring a

school district who has actual knowledge that its remedial action is inadequate and ineffective to take reasonable action to eliminate the behavior—which is not the law in this Circuit, Smith-Green's response to known instances of racial harassment would not be deliberately indifferent. *Vance*, 231 F.3d at 261. Furthermore, any dissatisfaction C.S. feels in regards to the punishment that the perpetrators did receive is irrelevant; C.S. does not have a right to any particular remedial demands, and the Court will not second guess the school administrators' disciplinary decisions. *Davis*, 526 U.S. at 648-49; *DT*, 588 F. Supp. 2d at 496.

As for the incidents in fifth grade and on the football field, while C.S.'s teacher and two football coaches were notified about the respective incidents, there is no indication in the record that Smith-Green or anyone else at the school was ever so informed.[23] Because Title VI requires actual notice, the principle of *respondeat superior* will not impute the knowledge of C.S.'s fifth grade teacher or the football coaches to Smith-Green. *DT*, 588 F. Supp. 2d at 494 (citing *Gesber*, 524 U.S. at 275-76); *see also Gesber*, 524 U.S. at 291 (holding that "a damages remedy will not lie under Title IX unless an official who at a minimum has authority to address the alleged discrimination and to institute corrective measures on the recipient's behalf has actual knowledge of discrimination in the recipient's programs and fails to adequately respond"). Rather, "[b]ased on a record devoid of any evidence suggesting that anyone informed [Smith-Green] of any facts regarding [the fifth grade and football field incidents] no reasonable jury could find that [Smith-Green] had actual notice of a racially hostile educational environment arising therefrom." *Id.*

---

[23]Although C.S.'s answer to the Defendants' fifth interrogatory states that the fifth grade teacher told T.L. that she would talk to the principal, T.L. did not recall whether the fifth grade incident was ever reported up the ladder at Smith-Green and there is no evidence in the record that the principal was ever actually made aware of it.

Furthermore, the *Davis* analysis requires that "a school official who possessed the requisite control over the situation had actual knowledge of, and was deliberately indifferent to, the alleged harassment." *Murrell*, 186 F.3d at 1247. While *Davis* is unclear about who exercises substantial control for the purposes of Title IX—and, therefore, Title VI—liability, it is possible that "where the victim is complaining about a fellow student's action 'during school hours and on school grounds,' teachers may well possess the requisite control necessary to take corrective action to end the discrimination." *Id.* at 1247-48 (quoting *Davis*, 526 U.S. at 646). What *Davis* does make clear is "that a school official who has the authority to halt known abuse, perhaps by measures such as transferring the harassing student to a different class, suspending him, curtailing his privileges, or providing additional supervision, would meet this definition." *Id.* at 1247. As such, "school districts can be found liable when a principal has actual notice of the conduct and did not take corrective action to end the alleged discrimination." *Silva v. St. Anne Catholic Sch.*, 595 F. Supp. 2d 1171, 1186 (D. Kan. 2009). Although, at this stage in the proceedings, the Court must accept as true an allegation that C.S.'s fifth grade teacher and football coaches were invested with the authority to halt other students' known racially hostile behavior, *id.* at 1248, C.S. fails to make any allegation whatsoever that the fifth grade teacher or the football coaches possessed sufficient control over the situation, or provide any evidence that the principal was aware of either incident, such that Smith-Green would be liable for their response, or lack thereof, whatever it may have been (and the record is devoid of that as well).

Additionally, focusing on the alleged perpetrators rather than each specific incident further supports the conclusion that the response of Smith-Green and its administrators to the alleged discriminatory acts was not clearly unreasonable. For instance, J.L. allegedly

perpetrated at least three acts of racial discrimination against C.S.: (1) making racial comments on the football field; (2) threatening to kill C.S. on his birthday; and (3) instructing his friends to beat C.S. up in the bathroom. While it does not appear that Defendants had notice of the racial comments on the football field, once Smith-Green and its administrators were informed that J.L. made a death threat against C.S., they acted promptly and reasonably by suspending the student. *See Rost*, 511 F.3d at 1123 (holding it was not clearly unreasonable for a school *not* to expel a student accused of harassment). Similarly, the student who called C.S. a racial epithet in fifth grade also drew a picture of him getting shot in the head in sixth grade. While it is unclear if the fifth grade teacher reported the first incident to anyone else or if the school disciplined this student for the first incident, when the middle school principal was informed of the incident in sixth grade, he acted reasonably by suspending the student.

Moreover, in analyzing this record, the Court notes that it is well-established that a party will be successful in opposing summary judgment only when it presents definite, competent evidence to rebut the motion. *E.g., Smith v. Severn*, 129 F.3d 419, 427 (7th Cir. 1997). While it is the Court's responsibility to determine if genuine issues of material fact exist, "[t]he parties . . . bear a concomitant burden to identify the evidence that will facilitate this assessment." *Waldridge*, 24 F.3d at 920. Accordingly, "[j]udges are not like pigs, hunting for truffles buried in briefs." *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991). For the incidents in which Smith-Green's response is not in the record, it is impossible for the Court to determine whether Smith-Green's response was "clearly unreasonable" as its response, if any, is *unknown*. Deliberate indifference, which is established by showing that the school's response was clearly unreasonable, is an element of proving a Title VI claim, and the plaintiff bears burden of

rebutting the motion for summary judgment with definite and competent evidence. *Smith*, 129

F.3d at 427. Summary judgment is "not a dress rehearsal or practice run; it is the *put up or shut

up* moment in a lawsuit, when a party must show what evidence it has that would convince a trier

of fact to accept its version of events." *Steen v. Myers*, 486 F.3d 1017, 1022 (7th Cir. 2007)

(citation omitted) (emphasis added). C.S. has simply failed to present enough evidence to rebut

the motion for summary judgment.

### 2. *Allegedly Discriminatory Acts by Couch, Lange, and Singer*[24]

C.S. also contends that the individual Defendants' investigation into the sexual

harassment allegations and their decision to expel him was "evidence of a hostile racial

environment at Smith-Green." (Pl.'s Resp. 8.) To establish the elements of a prima facie case

under Title VI, "a complaining party must demonstrate that [his] race, color, or national origin

was the motive for the discriminatory conduct." *Thompson v. Bd. of the Special Sch. Dist. No. 1*,

144 F.3d 574, 581 (8th Cir. 1998). The Court first notes that this argument is wholly

undeveloped, and underdeveloped arguments are considered waived. *Trentadue*, 619 F.3d at

654. Nonetheless, the Court will briefly address this claim.

In a Title VI action, a plaintiff's speculative and unsupported contentions that an

administrator's decision was motivated by discrimination is insufficient to survive summary

judgment. *See Thompson*, 144 F.3d at 581 (granting summary judgment to school when the

plaintiff offered no evidence that race was the motivating factor in his suspensions); *Shahid v.

Nw. Univ.*, No. 94 C 7721, 1997 WL 690680, at *4 (N.D. Ill. Oct. 21, 1997) (finding that the

plaintiff in a Title VI claim offered no evidence that two professors' decisions to deny the

---

[24]Although the Court previously noted, at note 14 *supra*, that the Title VI claims against the individual
Defendants fail as a matter of law, the Court will proceed to the merits so as to complete the record.

plaintiff's Ph.D. candidacy was motivated by anything other than their own academic judgment).

C.S. puts forth an unsupported and speculative argument that a group of students fabricated the

sexual harassment allegations and that Couch and Lange ignored inconsistencies among the

statements they received from other students and failed to take statements from students who

were on the bus and heard nothing. As noted above, however, there is no evidence in the record

supporting these speculations. While Lange testified that when talking with students about the

allegations on the bus, if a student said they did not know what he was talking about, then Lange

did not feel there was a reason to take a statement (Lange Dep. 38), this does not lead to a

conclusion that the investigation and ultimate decision to initiate expulsion proceedings against

C.S. were racially motivated or clearly unreasonable in light of what the investigation did

undercover. Rather, "to support a Title VI claim against defendants, plaintiff[ ] must still show

that the School was deliberately indifferent to racial hostility and, as discussed above, plaintiff[ ]

[has] not proffered sufficient evidence to support such a claim." *DT*, 588 F. Supp. 2d at 497.

In *DT*, the plaintiffs argued that the defendants' decision to suspend the plaintiff

following a hearing regarding a locker room theft constituted deliberate indifference and offered

expert testimony that the acts of racial hostility against the plaintiff lead to his theft. *Id.* The

court, however, found this argument unpersuasive and focused on the fact that the record

indicated that the defendants carefully considered the relevant evidence in reaching their

decision to suspend the plaintiff and concluded that "their resolution of the matter was not the

result of deliberate indifference." *Id.* The court further noted that the plaintiffs appealed the

suspension and it was affirmed twice, with the conclusions that the plaintiff's suspension was

nonetheless warranted based on the school's code of conduct and that the defendants did not fail

to consider relevant mitigating evidence in deciding to suspend the plaintiff. *Id.*

Here, Lange and Couch conducted an investigation into the sexual harassment allegations. They interviewed students on the bus and took the statements of those students who heard or saw something. They interviewed C.S. and took his statement. They reported the allegations and the results of their investigation to the Superintendent, who decided to initiate expulsion proceedings against C.S. C.S.'s expulsion was not based solely on this incident, but also on the other acts that C.S. committed throughout the year. Singer's expulsion notice points to three specific instances of C.S.'s misconduct: (1) the sexual harassment allegations; (2) the spraying of a "pungent odor" in English class; and (3) the fight with another student after P.E., which C.S. stated did *not* involve the exchange of racial words (C.S. Dep. 56) and for which both boys received the same punishment (Darnell Aff. Ex. 9). Moreover, Couch and Lange felt that the sexual harassment allegations were serious enough to warrant contacting the authorities, which suggests they believed at least some of the allegations, regardless of the fact that the police never pressed charges against C.S. Unlike the plaintiff in *DT*, C.S. does not make any argument that racial hostility contributed to his alleged actions on the bus or offer any expert testimony on this matter. While C.S. may be trying to connect his alleged actions to his learning disabilities, Smith-Green held a manifestation hearing that determined that C.S.'s conduct was not caused by and did not have a direct and substantial relationship to his math disabilities.

Furthermore, Singer, who was not involved in the investigation in any way, was the one who ultimately made the decision to expel C.S., citing the specific codes of conduct that C.S. violated (*see* Darnell Aff. Ex. 9) and after a hearing in which T.L. felt as though she were given an opportunity to present all the evidence she wanted (T.L. Dep. 118). Accordingly, the record

indicates that the Defendants carefully considered the relevant evidence in reaching their decision to expel C.S. and that their investigation and subsequent decision to expel C.S. was not clearly unreasonable. Rather, the decision was warranted by C.S.'s violations of the Churubusco High School Code of Conduct and, thus, did not constitute deliberate indifference. *DT*, 588 F. Supp. 2d at 497. Furthermore, C.S. has failed to offer any evidence that the initiation of expulsion proceedings against him and his subsequent expulsion were motivated by anything other than the Defendants' judgment about the appropriate discipline, *see Shahid*, 1997 WL 690680, at *4, and he has failed to offer any evidence, besides his own conclusory assertions and speculation, that the Defendants were motivated by a desire to "divest the school" of him (Pl.'s Resp. 7) or by racial hostility.

Once again, summary judgment is the "put up or shut up" moment of a lawsuit, *Steen*, 486 F.3d at 1021, and C.S. has failed to present sufficient evidence to rebut Defendants' motion for summary judgment. While, if true, the treatment C.S. received in Smith-Green schools is disturbing, the record simply falls short of establishing a basis for Title VI liability. *Trentadue*, 619 F.3d at 654. Accordingly, Smith-Green is entitled to summary judgment on C.S.'s claim of a hostile racial environment under Title VI for both student-on-student harassment and any alleged discriminatory acts by the individual Defendants.

## B. *Fifth Amendment* **Miranda** *Violation*[25]

Besides his Title VI claim, C.S. also alleges that Defendants violated his *Miranda* rights

when Lange and Couch questioned him and took his statement at the school because he did not

have an opportunity to leave and was never advised that he did not have to incriminate himself.

(Pl.'s Resp. 7.) C.S.'s *Miranda* claim, however, fails for several reasons.

First, Lange and Couch's questioning of C.S. did not implicate the safeguards of

*Miranda*. Under *Miranda v. Arizona*, 384 U.S. 436, 444 (1966), "a suspect interrogated by law

enforcement officers while in custody must be notified of his constitutional rights to counsel and

against self-incrimination." *United States v. Thompson*, 496 F.3d 807, 810 (7th Cir. 2007)

(construing *Miranda*). *Miranda*'s protections are not triggered, however, until the suspect is

both "in custody" and subjected to "interrogation." *Id.* (citing *United States v. Barker*, 467 F.3d

625, 628 (7th Cir. 2006)). For the purposes of *Miranda*, a person is "in custody" when there is

"questioning initiated by law enforcement officers after a person has been taken into custody or

otherwise deprived of his freedom of action in any significant way." *Barker*, 467 F.3d at 628

(quoting *Miranda*, 348 U.S. at 444). "Custody" means "a situation in which the suspect knows

he is speaking with a government agent and does not feel free to end the conversation; the

essential element of a custodial interrogation is coercion." *Thompson*, 496 F.3d at 810 (quoting

---

[25]The Court notes that nowhere in C.S.'s Complaint does he make a Fifth Amendment *Miranda* violation claim. While he makes a false arrest claim under the Fourth Amendment (Compl. ¶ 28), *Miranda* violations are governed by the Fifth Amendment, *see, e.g.*, *Sornberger v. City of Knoxville*, 434 F.3d 1006 (7th Cir. 2006). C.S. first brings this claim in his response to the Defendants' Motion for Summary Judgment. However, "[a] claim raised for the first time in response to a motion for summary judgment is not properly before the court." *Chinn v. Cantrell*, No. 2:04-cv-393, 2006 WL 2927595, at *4 (N.D. Ind. Oct. 11, 2006); *see Aida Food & Liquor, Inc. v. City of Chicago*, 439 F.3d 397, 402 (7th Cir. 2006) ("[A] response to summary judgment is hardly a timely filing in which to raise an issue."); *Shanahan v. City of Chicago*, 82 F.3d 776, 781 (7th Cir. 1996) ("A plaintiff may not amend his complaint through arguments in his brief in opposition to a motion for summary judgment."). Nonetheless, the Court will address this argument.

*United States v. Saylers*, 160 F.3d 1152, 1159 (7th Cir. 1998)).

The question is whether, under the totality of the circumstances, a reasonable person would have felt at liberty to end the interrogation and leave. *United States v. Littledale*, 652 F.3d 698, 701 (7th Cir. 2011) (citing *Yarborough v. Alvarado*, 541 U.S. 652, 662 (2004)). While this is an objective inquiry, the Supreme Court has recently held that a minor's age is relevant in the custody analysis "so long as the child's age was known to the officer at the time of the police questioning, or would have been objectively apparent to a reasonable officer." *J.D.B. v. North Carolina*, 131 S. Ct. 2394, 2406 (2011).

Although a child's age factors into the custody analysis, custody and interrogation do not exist without the presence of law enforcement officers. *See Miranda*, 384 U.S. at 444 (defining "custodial interrogation" as "questioning initiated by *law enforcement officers* after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way" (emphasis added)). Even the holding of *J.D.B.* itself is limited to the questioning of children by law enforcement officers. *See J.D.B.*, 131 S. Ct. at 2406 (holding that a child's age should be considered "so long as the child's age was known to the *officer* at the time of *police* questioning, or would have been objectively apparent to a reasonable *officer*" (emphasis added)).

Accordingly, in the school context, courts have drawn distinctions between a student being questioned by only a school official at school and a student being questioned by a law enforcement officer at school. *Compare S.E. v. Grant Cnty. Bd. of Educ.*, 544 F.3d 633, 641 (6th Cir. 2008) (finding that an assistant principal who was not acting at the behest of law enforcement officers and whose questioning of a student occurred outside of the presence of law enforcement officers was not required to give the student *Miranda* warnings) *and Boynton v.*

*Casey*, 543 F. Supp. 995, 997 (D. Me. 1982) (holding that a student was not entitled to *Miranda* warnings prior to being questioned by school authorities), *with Husband v. Turner*, No. 07-CV-391-bbc, 2008 WL 2002737, at *3 (W.D. Wis. May 6, 2008) (determining that a student was entitled to *Miranda* warnings when he was escorted to the interrogation by security guards and an assistant principal, was questioned by police officers in a closed room at school with no one else present after the officers had identified themselves as police officers, and was never told he was free to refuse to answer the questions and leave). Neither the Supreme Court nor the Seventh Circuit has answered the question of whether a police interview of a juvenile at school is custodial and, thus, subject to *Miranda*. *Husband*, 2008 WL 2002737, at *3.

Similarly, while no case from either court has directly addressed the situation in which a school official, rather than a police officer, does the questioning, Indiana courts have held that a student being questioned by school officials, rather than law enforcement officers, at school is not entitled to *Miranda* warnings prior to questioning. *G.J. v. State*, 716 N.E.2d 475, 477 (Ind. Ct. App. 1999) (finding *Miranda* safeguards inapplicable where student was not in police custody and was questioned by a school official rather than a police officer); *S.A. v. State*, 654 N.E.2d 791, 797 (Ind. Ct. App. 1995), *disapproved of on other grounds by Alvey v. State*, 897 N.E.2d 515 (Ind. Ct. App. 2008) and *by Alvey v. State*, 911 N.E.2d 1248 (Ind. 2009) (holding that a student was not subjected to custodial police interrogation and, thus, that *Miranda* was inapplicable when he was questioned in the vice principal's office in a public school by the vice principal and his father, the atmosphere was not coercive, and the student was not in police

custody or interrogated by a police officer).[26]  This can be true even where a police officer is simply present while the school official, acting on his own, questions the student.  *S.G. v. State*, 956 N.E.2d 668, 679-80 (Ind. Ct. App. 2011); *P.M. v. State*, 861 N.E.2d 710, 713-14 (Ind. Ct. App. 2007).

*Miranda* was concerned with the "intimate connection between the privilege against self-incrimination and police custodial questioning" and the "inherently compelling pressures" in custodial police interrogation.  384 U.S. at 458, 467.  In coming to the conclusion that a student is not entitled to *Miranda* warnings before being questioned by school officials, the Indiana Court of Appeals focused on the policy underlying the *Miranda* safeguards—overcoming the inherently coercive and police dominated atmosphere of custodial interrogation—determining that, when school officials question students in school outside of the presence of law enforcement officers and free from their influence, there is no such coercive atmosphere against which to protect.  *S.A.*, 654 N.E.2d at 797.

Here, C.S. was questioned by Couch and Lange at school.  Unlike *Husband*, 2008 WL 2002737, at *3, in which the student was left alone in a closed room with police officers who then questioned him, no law enforcement officers were present or involved during C.S.'s questioning or statement preparation.  Moreover, nothing suggests that Couch and Lange were acting at the behest of law enforcement officials in questioning C.S., which further supports the conclusion that Lange and Couch were not required to advise C.S. of his *Miranda* rights.  *See S.E.*, 544 F.3d at 641.  Therefore, because C.S. was questioned by school officials, who were

---

[26]This is in line with federal decisions addressing the question, *S.E.*, 544 F.3d at 641; *Boynton*, 543 F. Supp. at 997, as well as the holdings of other state courts, *e.g., In re Corey L.*, 250 Cal. Rptr. 359, 361 (Cal. Ct. App. 1988); *People v. Pankhurst*, 848 N.E.2d 628, 633-36 (Ill. App. Ct. 2006); *Commonwealth v. Ira I.*, 791 N.E.2d 894, 902 (Mass. 2003).

acting on their own and without involvement from law enforcement, C.S. was not undergoing "custodial interrogation," and, consequently, the *Miranda* safeguards were inapplicable to him.[27]

Nonetheless, even if C.S. were entitled to *Miranda* warnings prior to questioning by the school officials, C.S.'s claim would still fail because his statements were never used against him in a criminal proceeding. In *Chavez v. Martinez*, 538 U.S. 760, 771-72 (2003), the Supreme Court narrowed the availability of the Fifth Amendment as a basis for civil liability, holding that a police officer's questioning of the plaintiff without *Miranda* warnings did not violate the Self-Incrimination Clause of the Fifth Amendment because the plaintiff's compelled statements had not been used against him in a criminal case. While the *Chavez* plurality declined to define "the precise moment when a 'criminal case' commences," at the very least, it requires "the initiation of a legal proceeding." *Sornberger*, 434 F.3d at 1025 (quoting *Chavez*, 538 U.S. at 766). In *Sornberger*, the Seventh Circuit expanded on the *Chavez* decision, holding that even when the un-warned statements are not used at trial, earlier "courtroom uses," such as use in a probable cause hearing, a bail hearing, or arraignment, may provide a basis for civil liability. 434 F.3d at 1026-27.

Drawing on *Sornberger*, the Seventh Circuit has also held that the use of un-warned statements at a suppression hearing constituted use in a "criminal case," *Best v. City of Portland*, 554 F.3d 698, 702-03 (7th Cir. 2009), but that using the statement to simply arrest the plaintiff is

_____

[27]Even if *Miranda* did apply to C.S.'s situation, and to the extent that they were acting as "government officials" (and not as private citizens), the Defendants would be entitled to qualified immunity as C.S.'s right to *Miranda* warnings when being questioned at school by school officials was not so clear that reasonable officials would have known that failure to give *Miranda* warnings would violate C.S.'s Fifth Amendment rights. *See Husband*, 2008 WL 2002737, at *4. Just as there is no controlling precedent that addresses the custodial nature of school interrogations by police officers, no precedent analyzes the custodial nature of school questioning by school officials. *Id.* Moreover, this is not such an obvious constitutional violation that no case on point is necessary. *Id.* As such, Defendants would be entitled to qualified immunity for their failure to give such a warning (if it was required).

insufficient to provide a basis of civil liability because "interrogation that yields incriminatory evidence never used in court does not support an award of damages," *Hanson v. Dane Cnty., Wis.*, 608 F.3d 335, 339 (7th Cir. 2010). In *Hanson*, the Court found that the defendant officers did not violate the plaintiff's privilege against self-incrimination, regardless of whether they should have given him *Miranda* warnings, because the plaintiff never contended that his statements were introduced into evidence in a criminal prosecution as there was no trial and he never argued that his statements were used in the two court appearances he did make. *Id.* Similarly, when a plaintiff fails to make an argument that the alleged *Miranda* violation led to the use of his un-warned statement against him in a criminal case or point to any evidence supporting such a claim, his § 1983 claim fails as a matter of law. *Paige v. City of Fort Wayne*, No. 1:09-cv-143, 2010 WL 3522526, at *8 (N.D. Ind. Sept. 2, 2010).

In the instant case, C.S.'s statements were never used against him in a criminal case. He was never arrested, and after a preliminary inquiry by Whitley County Juvenile Probation Department, all charges against C.S. were dismissed. (Pl.'s Answer to Defs.' Interrog. No. 5.) C.S.'s un-warned statements were never used against him in the courtroom at any proceeding as they were against the *Sornberger* and *Best* plaintiffs. The statements were never even used to arrest him, which would have been insufficient to provide the basis for civil liability in any event. *Hanson*, 608 F.3d at 339. Moreover, C.S. does not argue that the statements were used against him in a criminal case, which causes his claim to fail as a matter of law. *Paige*, 2010 WL 3522526, at *8. Therefore, Defendants are entitled to summary judgment on C.S.'s Fifth Amendment claim.

## VI. CONCLUSION[28]

For the reasons set forth above, the Court GRANTS the Defendants' Motion for

Summary Judgment (Docket # 24) and DIRECTS the Clerk to enter judgment in favor of

Defendants and against Plaintiff C.S.

SO ORDERED.

Entered this 28th day of December, 2011.

/s/ Roger B. Cosbey
Roger B. Cosbey
United States Magistrate Judge

---

[28]Defendants also argue that they are entitled to immunity pursuant to the Eleventh Amendment. (Defs.' Mem. in Supp. of Summ. J. 22-24.) As the Court is granting summary judgment to Defendants on all of C.S.'s claims, there is no need to address this argument.